STEPHEN F. WILLIAMS, Senior Circuit Judge,
concurring.
Two generations have now grown up with Garrett Hardin’s famous article, The Tragedy of the Commons, 162 SCIENCE 1243 (1968), exploring the risk of over-exploitation when many people have unlimited access to a resource. Using the simple example of a common field in which neighboring farmers are all entitled to pasture their cows, Hardin pointed out that if there are no constraints the farmers will keep adding cows to the point where a farmer who did so would gain nothing; because of the trampling and crowding of the already grazing cows, the extra cow and her owner would enjoy no net benefits. Under management aimed at maximizing the net value of the pasture, by contrast, farmers would add cows only to the point where the feeding benefits for the next added cow just equaled the reduction in benefits for cows already in the field. Here, the Federal Energy Regulatory Commission flirted with Hardin’s insight, but it didn’t click.
As the court’s opinion makes clear, FERC supervised the creation and adoption of a “recreation plan” for the Grand Lake O’ the Cherokees. Although the drafters left the ultimate goal somewhat obscure, the plan points strongly toward net-value maximization. Using the ambiguous term “carrying capacity,” it nonetheless looks essentially to “benefits (net of congestion disutilities),” with suitable additional adjustments for out-of-pocket costs and ecological damage not already counted as part of the “congestion disutilities.” Pensacola Recreation Management Plan, App. F, at 41.
In considering whether to let the Grand River Dam Authority increase the number of boat slips, FERC never quite determined whether the extra boats would push usage beyond the lake’s “carrying capacity.” To resolve its apparent doubts, FERC reached out to find that any resulting injury was balanced by “beneficial impacts on employment, tax revenues and tourism.” Grand River Dam Authority, Order Approving Non-Project Use of Project Property, 105 FERC ¶ 61,100 at 61,-506-07 (2003). It appears from the briefing that FERC relies on § 4(e)’s reference to “power and development purposes” and § 10(a)(l)’s reference to “improvement and utilization of water-power development” to justify such a balancing operation. As the court’s opinion emphasizes, petitioners here never claimed that the Commission lacked statutory authority to consider such factors in this context. Thus we cannot resolve that issue. There are, however, reasons to question FERC’s implicit read- ■ ing of the statute.
The references seem aimed directly at the issue of licensing hydro power dams themselves, a process obviously involving a trade-off between the values of natural amenity and power development. Further, in considering power development, the Commission must consider associated development: there would, for example, be little point in a hydropower dam if there were no prospect of users for the resulting power.
Here, by contrast, a recreational resource has been created as a side effect of power development. The sole issue is how to use it. Can the Commission rely on expected increases in tourism, employment and tax revenues, under the “development” language of §§ 4(e) and 10(a)(1), to justify the possible loss in recreational value?
Consider tourism first. If the plan has identified a standard that maximizes the lake’s net value as a tourist resource (the level at which the marginal benefit from an *12 extra tourist equals the marginal detriment in congestion and other costs), then to breach that standard, in the name of “development,” is to say that FERC wants tourism to a degree that- diminishes the lake’s contribution to aggregate welfare. Such an interpretation of the statute is not self-evidently reasonable.
Taxes and employment seem no better a fit. Consider another form of net maximization of a resource, oil-and-gas unitization. Unitization aims at preventing over-exploitation of the oil or gas field, i-.e., exploitation that reduces the field’s net value. Among the methods employed is limiting the number of wells; at some point the reductions in output at other wells exceed the costs of an extra well, just as the congestion costs of an extra boat (or cow!) at some point exceed its benefits. Suppose the Commission were in charge of managing oil and gas pooling and unitization, and it found that optimal exploitation of a field called for 20 wells. But then it approved the addition of another 10 because their construction and operation would generate local taxes and employment. Could the employment and taxes drawn to the locality (and presumably away from another locality, as the money spent on the extra wells would have had multiplier effects in its alternative uses) qualify as “development” under the guiding statutes? Again, the answer is not obviously affirmative.
Petitioners, however, failed to question whether the Commission had authority to invoke tourism, employment and tax revenues as offsetting values, or even to argue that reliance on supposed increases in the three was arbitrary or capricious in this context. I therefore join in the opinion of the court.